# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MATTHEW ONYSHKO, and JESSICA ONYSHKO, his wife, | ) Civil Action No. ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) ) |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | ) ) ) |
| Defendant. | ) ) |

## COMPLAINT

Plaintiffs, Matthew Onyshko ("Plaintiff" or "Onyshko") and Jessica Onyshko ("Plaintiff-Wife") (collectively "Plaintiffs") by their counsel, Jason E. Luckasevic of GOLDBERG, PERSKY & WHITE, P.C., bring this Complaint against Defendant National Collegiate Athletic Association (hereinafter "NCAA" or "Defendant") and allege the following upon information, belief and investigation of counsel:

### NATURE OF ACTION

1. This action seeks to recover damages for injuries sustained by the Plaintiffs as a direct and proximate result of the tortious conduct of the Defendant in connection with the Defendant's failure to take effective action to protect Onyshko from the long-term effects of concussions and sub-concussive blows to the head suffered while he played collegiate football in the NCAA.

2. The NCAA's constitution states that college athletics shall be conducted in a manner designed to protect the physical and educational well being of college

athletes. Article 2.2 of the NCAA Constitution specifically addresses the "Principle of Student-Athlete Well-Being" and provides in pertinent part:

> **2.2 The Principle of Student-Athlete Well-Being**
> Intercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well being of student-athletes. (Revised: 11/21/05).
>
> ***
>
> **2.3.3 Health and Safety**
> It is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student-athletes. (Adopted: 1/10/95.)

3. Article 2, §2.82 of the NCAA's Constitution, further states that the NCAA "shall assist the institution in its efforts to achieve full compliance with all rules and regulations..."

4. Furthermore, in its annually published Sports Medicine Handbook, the NCAA explicitly states that "student-athletes rightfully assume that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risks of injury from athletics' participation."

5. The NCAA breached its duty to protect Onyshko in the face of long-standing and overwhelming evidence regarding the need to do so. The NCAA ignored this duty to protect Onyshko and failed to inform him of the true risks associated with concussions and sub-concussive hits suffered while playing collegiate football. Additionally, the NCAA has increased the risk to Onyshko of suffering the injuries described herein.

6. The NCAA failed to educate its football-playing athletes, like Onyshko, on the long-term, life-altering risks and consequences of head trauma in football. They

failed to establish known protocols to prevent, mitigate, monitor, diagnose, and treat neurological disorders.

7. During the time period of the events in this action, the NCAA failed to address and/or correct the coaching of tackling or playing methodologies that cause head injuries; the NCAA failed to educate coaches, trainers and student-athletes as to the symptoms indicating possible concussions; the NCAA failed to implement system-wide "return to play" guidelines for student-athletes who have sustained concussions; and the NCAA failed to implement system-wide guidelines for the screening and detection of head injuries.

8. The NCAA engaged in a long-established pattern of negligence and inaction with respect to concussions and concussion-related maladies sustained by student-athletes.

9. Accordingly, Plaintiffs seek financial recovery for the long-term and chronic injuries, financial losses, expenses and intangible losses, suffered as a result of the NCAA's negligence.

## JURISDICTION AND VENUE

10. This Court has original diversity jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1) and §1332(c)(1) in that this a civil action in which the amount in controversy exceeds the sum or value of $75,000 and in which Plaintiffs are citizens of a state other than the state wherein the NCAA has its principal place of business.

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1), (c), and (d) as: the NCAA is deemed to reside in this judicial district because it is subject to personal jurisdiction here; and substantial part of the events or omissions giving

rise to the claims asserted herein emanated from activities within this jurisdiction, and the Defendants conduct substantial business in this jurisdiction.

## PARTIES

12. Plaintiff, Matthew Onyshko, is a natural person and a citizen of the State of Pennsylvania. Mr. Onyshko was a student at California University of Pennsylvania and played college football from 1999-2003. During his five (5) year collegiate football career, he experienced numerous repeated blows to the head. On three specific occasions, he lost consciousness for at least thirty seconds. After graduation, Mr. Onyshko progressively experienced frequent severe headaches, numbness, twitching, muscle atrophy, fatigue, loss of mobility, slurred speech, difficulty swallowing, weakness and other neurological symptoms. Mr. Onyshko was recently diagnosed with a progressive brain and spinal cord injury with ALS-like symptoms caused by repeated head trauma during his college football career in the NCAA.

13. Plaintiff, Jessica Onyshko, is a natural person and wife of Matthew Onyshko and a citizen of the State of Pennsylvania.

14. Defendant National Collegiate Athletic Association ("NCAA") is an unincorporated association that acts as the governing body of college sports. Its principal office is located in Indianapolis, Indiana. There are more than 400,000 student-athletes competing in three divisions at over 1,000 colleges and universities that are member schools within the NCAA. Through various licensing programs, the NCAA takes in, on average, over $750 million in revenues each year.

## FACTUAL ALLEGATIONS

15. College athletics at NCAA member institutions are tightly regulated by the NCAA Constitution, Operating Bylaws, and Administrative Bylaws, which comprise over 400 pages of detailed rules that govern in great detail all matters relating to athletic events, including: player well-being and safety, playing time and practice rules for each sport, contest rules, amateurism, recruiting, eligibility and scholarships.

16. Upon information and belief, the NCAA Constitution, Bylaws, and other legislative policies are contained within the NCAA Manual, which is updated at an annual conference and published annually for member schools. The NCAA promulgates sport-specific standards through its Playing-Rules Committees. The playing-rules committees are comprised primarily of coaches, who act as consultants to the Association in the event that any "major changes" to the rules are considered. However, the primary responsibility for developing and interpreting rules falls on the secretary-rules editor.

17. The NCAA also publishes a Sports Medicine Handbook (the "Handbook") which includes policies and guidelines for treatment and prevention of injury, as well as return-to-play instructions. The Handbook is also produced annually and sent directly to head athletic trainers, as well as various individuals at NCAA member institutions.

18. The NCAA constitution clearly defines the NCAA's purposes and fundamental policies to include maintaining control over and responsibility for intercollegiate sports and student-athletes. Then NCAA Constitution states in pertinent part:

> The purposes of this Associations are:
>
> (a) To initiate, stimulate and improve intercollegiate athletics programs for student athletes....;
> (b) to uphold the principal of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association;....NCAA Const., Art. 1, sec. 1.2(a),(b).

19. The NCAA Constitution also defines one of its "Fundamental Policies" as the requirement that "Member institutions shall be obligated to apply and enforce this legislation, and the enforcement procedures of the Association shall be applied to an institution when its fails to fulfill this obligations."

20. In fact, the NCAA Constitution mandates that "each member institution must establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's education experience." NCAA Const., Art.2, sec. 2.2.1 (Adopted: 1/10/95)

21. To aid member institutions with the tools that they need to comply with NCAA legislation, the NCAA Constitution promises that "[t]he Association shall assist the institution in its efforts to achieve full compliance with all rules and regulations...."

22. Upon information and belief, the NCAA maintains The Committee on Safeguards and Medical Aspects of Sports, which is publicly touted by the NCAA as "serv[ing] to provide expertise and leadership to the NCAA in order to provide a healthy and safe environment to student-athletes through research, education, collaboration and policy development."

23. Upon information and belief, one of the NCAA's "core concepts and priorities" was to use its knowledge to promote health and safety:

> The NCCA has been conducting injury surveillance for more than 20 years. Over time, the underlying principle of the program has remained unchanged – to promote and support student athlete health and safety.

24. Upon information and belief, on an annual basis, the NCAA Committee on Competitive Safeguards and Medical Aspects of Sports publishes ("Medical Committee") the NCAA Sports Medicine Handbook ("Handbook") "to formulate guidelines for sports medicine care and protection of student-athlete's health and safety" and "to assist member schools in developing a safe intercollegiate athletic program." The Medical Committee recognizes that the Handbook "may constitute some evidence of the legal standard of care." The Handbook expressly recognizes that "student-athlete rightly assume that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risks of injury from athletics participation.

25. Thus, the NCAA has described, time and again, its responsibility for the health and well-being of student-athletes.

26. Despite this recognition of a duty to care and protect the well-being of the student-athlete, the NCAA has failed to protect Onyshko from the long term, life-altering risks and consequences of head trauma he sustained while participating in collegiate football.

27. The NCCA has failed to educate Onyshko about the long-term, life-altering risks and consequences of head injuries that can result from participation in the game of football.

28. In the face of its overwhelming and superior knowledge of these risks, as compared to that of the student-athletes, the NCAA's conduct constitutes negligence.

7

29. Medical science has known for many decades that repetitive and violent jarring of the head or impact to the head can cause Mild Trauma Brain Injury ("MTBI") with a heightened risk of long term, chronic neuro-cognitive maladies.

30. The NCAA has known or should have known for many years that MTBI generally occurs when the head either accelerates rapidly and then is stopped, or is rotated rapidly.

31. The NCAA has known or should have known for many years that medical evidence has shown that symptoms of MTBI can appear hours or days after the injury, indicating that the injured party has not healed from the initial blow.

32. The NCAA has known or should have known for many years that once a person suffers an MTBI, he is up to four times more likely to sustain a second one. Additionally, after suffering even a single sub-concussive or concussive blow, a lesser blow may cause MTBI, and the injured person requires more time to recover.

33. The NCAA has known or should have known for many years that collegiate football players and their families, including Onyshko, were unaware of the serious risk posed to the players' long-term cognitive health, caused by repeated head impacts while playing football.

34. The NCAA has known or should have known for many years clinical and neuro-pathological studies by some of the nation's foremost experts demonstrate that multiple head injuries or concussions sustained during a football player's career can cause severe cognitive problems such as depression and early-onset dementia.

35. The NCAA has known or should have known for many years that published peer review scientific studies have shown that repeated traumatic head impacts

8

(including sub-concussive blows and concussions) cause ongoing and latent brain injury. For decades, these injuries have been documented and associated with sports-related head impacts in both football and boxing.

36. The NCAA has known or should have known for many years that neuropathology studies, brain imaging tests, and neuropsychological tests on many former football players have established that football players who sustain repetitive head impacts while playing the game have suffered and continue to suffer brain injuries that result in any one or more of the following conditions: early –onset Alzheimer's Disease, ALS or Lou Gehrig's Disease, dementia, depression, deficits in cognitive functioning, reduced processing speed, attention, and reasoning, loss of memory, sleeplessness, mood swings, personality changes, and the debilitating and latent disease known as Chronic Traumatic Encephalopathy ("CTE").

37. Since the early 1970's the high incidence of concussions among student-athletes in many different sports, including football, hockey, and soccer, has been well known to the NCAA. Further, based on studies that the NCAA *itself* paid for the NCAA has been aware that a history of multiple concussions has been associated with greater risk of future brain defects in student-athletes, including symptoms of post-traumatic brain injury such as headaches, dizziness, loss of memory, impulse control problems, and CTE.

38. From its inception, the NCAA had a duty to protect football players like the Plaintiff from health and safety risks. The NCAA held itself out as acting in the Onyshko's best interests. Plaintiff relied on the NCAA to disclose relevant risk information and protect his health and safety.

39. The NCAA's accumulated knowledge about head injuries to football players, and the associated health risks, was at all times superior to that available to student-athletes like the Plaintiff.

40. Prior to 2003, the NCAA specifically became aware of the correlation between concussions and depression, dementia, ALS, and early on-set Alzheimer's disease. Despite this knowledge, the NCAA failed to act reasonably by developing appropriate means to identify at-risk players and guidelines or rules regarding return to play criteria. The NCAA's inaction prior to 2003 increased the risk of long-term injury and illness in student-athletes, including Plaintiff.

41. For years prior to 2003, the NCAA has been aware that multiple blows to the head can lead to long-term brain injury, including, but not limited to, memory loss, dementia, depression and CTE and its related symptoms.

42. In 1937, the American Football coaches Association published a report warning that players who suffer a concussion should be removed from sports demanding personal contact.

43. In 1952, an article published in the *New England Journal of Medicine* recommended a three-strike rule for concussions in football (*i.e.*, recommending that players cease to play football after receiving their third concussion).

44. In 1969 (and the again in the 1973 book entitled *Head and Neck Injuries in Football*), a paper published in the *Journal of Medicine and Science in Sports* by a leading medical expert in the treatment of head injuries, recommended that any concussive event with transitory loss of consciousness requires the removal of the football player from play and requires monitoring.

45. In the 1960's and 70's, the development of the protective face mask in football allowed the helmeted head to be used as a battering ram. By 1975 the number of head and neck injuries from football that resulted in permanent quadriplegias in Pennsylvania and New Jersey lead to the creation of the National Football Head and Neck Registry, which was sponsored by the National Athletic Trainers Association and the Sports Medicine Center at the University of Pennsylvania.

46. In the early 1980's, the Department of Neurosurgery at the University of Virginia published studies on patients who sustained MTBI and observed long-term damage in the form of unexpected cognitive impairment. The studies were published in neurological journals and treatises within the United States.

47. In 1982, the University of Virginia and other institutions conducted studies on college football teams that showed that football players who suffered MTBI suffered pathological short-term and long-term damage. With respect to concussions, the same studies showed that a person who sustained one concussion was more likely to sustain a second, particularly if that person was not properly treated and removed from activity so that the concussion symptoms were allowed to resolve.

48. The same studies showed that two or more concussions close in time could have serious short-term and long-term consequences in both football players and other victims of brain trauma.

49. Kevin Guskiewicz published a study of concussions in college football players titled, *"The NCAA Concussion Study"* in the *Journal of the American Medical Association* in 2003.

50. By 1991, three distinct medical professionals/entities—Dr. Robert Cantu of the American College of Sports Medicine, the American Academy of Neurology, and the Colorado Medical Society—developed return-to-play criteria for football players suspected of having sustained head injuries.

51. The NCAA implemented an injury surveillance system in 1982. In 1994, Randall W. Dick, Assistant Director of Sports Science for the NCAA, authored an article entitled "A Summary of Head and Neck Injuries in Collegiate Athletics' Using the NCAA Injury Surveillance System" published by the American Society for Testing and Materials. The article identified concussions as the most prevalent type of head injury and noted that evaluation of concussions may be a first step to the prevention of severe injuries. The author cautioned that "[m]edical personnel should be educated on the diagnosis and treatment of such injuries in all sports and rules protecting the head and neck should be enforced." In spite of this admonition, the NCAA did not proceed to educate its active football players on the long term risks of concussions.

52. In 1996, the NCAA Sports Science Safety Subcommittee on Competitive Safeguards and Medical Aspects of Sports discussed the concussion data in football and other sports and recognized the football helmet would not prevent concussions.

53. In 1999, the National Center for Catastrophic Sport Injury Research at the University of North Carolina conducted a study involving eighteen thousand (18,000) collegiate and high school football players. The research showed that once a player suffered one concussion, he was three times more likely to sustain a second in the same season.

54. A 2001 report by Dr. Frederick Mueller that was published in the Journal of Athletic Training reported that a football-related fatality has occurred every year from 1945 through 1999, except for 1990. Head-related deaths accounted for 69% of football fatalities, cervical spine injuries for 16.3%, and other injuries for 14.7%. From 1984 to 1999, sixty-nine football head-related injuries resulted in permanent disability.

55. In 2002, a prominent study published in the Archives of Clinical Neuropsychology entitled *Enduring Effects of Concussion in Youth Athletes* documented there were enduring effects in youth who have experienced a history of two or more concussions. These include decreased overall neuropsychological functioning, as well as decreased mental speed.

56. Researchers from the National Institute for Occupational Safety and Health ("NIOSH") wrote in the journal *Neurology* that professional football players are much more likely to die from Alzheimer's disease, ALS (Lou Gehrig's Disease) and Parkinson's Disease as well as other neurodegenerative diseases which are caused by brain cell damage. *Neurology* (06 Sept. 2012).

57. In sum, the NCAA has known for years prior to 2003 that MTBI experienced in football can and does lead to long-term brain injury in football players, including, but not limited to, memory loss, dementia, depression, and CTE and its related symptoms.

58. Years later, in 2010, the NCAA adopted a concussion management policy that delegated the concussion problem to its member schools. This public relations maneuver, in the face of decades of knowledge coupled with inaction, was too little and too late for Plaintiff.

## CAUSES OF ACTION

### COUNT I

### NEGLIGENCE
### (AGAINST THE NCAA)

59. Plaintiffs repeat and re-allege each of the allegations contained in the foregoing paragraphs.

60. At all relevant times, the NCAA had a duty toward Onyshko to supervise, regulate, monitor and provide reasonable and appropriate rules to minimize the risk of injury to him while playing collegiate football.

61. Onyshko did reasonably and justifiably rely upon the NCAA to protect his health and safety.

62. The NCAA acted carelessly and negligently in its position as the regulatory body for collegiate football teams and its student-athletes, including the Plaintiff. The NCAA knew or should have known that its actions or inaction in light of the rate and extent of concussions reported and made known to the NCAA would cause harm to the Plaintiff in both the short and long term.

63. The NCAA was careless and negligent by breaching the duty of due care it assumed for the benefit of the Plaintiff, both generally and in the following particular respects:

   a. Failing to educate Plaintiff concerning symptoms that may indicate a concussion has occurred;

   b. Failing to warn Plaintiff of the risk of unreasonable harm resulting from repeated concussions;

   c. Failing to disclose to Plaintiff the special risks of long-term complications from repeated concussions and return to play;

   d. Failing to disclose to Plaintiff the role of repeated concussions in causing chronic life-long cognitive and neurological decline;

  e. Failing to promulgate rules and regulations to adequately address the dangers to Plaintiff of repeated concussions and failing to implement a return-to-play policy to minimize long-term chronic cognitive and neurological problems for which was at an increased risk;

  f. Misrepresenting pertinent facts that Plaintiff needed to be aware of to make determinations of the safety of return to play;

  g. Concealing pertinent facts necessary for the Plaintiff to make an informed decision about participating in football;

  h. Failing to adopt rules and reasonably enforce those rules to minimize the risk of Plaintiff suffering debilitating concussions; and

  i. Increasing the risk of harm to the Plaintiff.

64. The Plaintiffs have sustained past medical expenses and will in all likelihood, incur future medically-related costs associated with the harm suffered and injuries and disability referenced above.

65. The Plaintiff has in the past experienced, and he may in the future suffer, from an assortment of problems associated with the harm and injuries described including, but not limited to, headaches, numbness, twitching, fatigue, muscle neuropathy, loss of mobility, slurred speech, difficulty swallowing and other neurodegenerative symptoms, as well as embarrassment, loss of the pleasures of life, requiring his use of a wheelchair, feeding tube and a diaphragm pacemaker, which will eventually lead to a progressive and painful death.

66. As a result of the foregoing, Plaintiffs have suffered damages and will in the future suffer damages caused by the misconduct of the NCAA.

67. The Plaintiffs are entitled to damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs request judgment against Defendant in an amount in excess of $75,000, together with interest and costs.

## COUNT II

## CONSORTIUM
## (AGAINST THE NCAA)

68. Plaintiffs incorporate by reference the all above paragraph of this Complaint as if they have been set forth fully herein.

69. As a direct and proximate result of the acts of the Defendant as set forth, above, Wife-Plaintiff has suffered and will continue to suffer as follows:

   a. Loss of consortium, spousal support, services, society and companionship for which the Defendant is liable.

   b. Plaintiff-wife has been required to and will continue to spend money for medicine, medical care, nursing, hospital, medical appliances and household care for the treatment of her husband.

WHEREFORE, Plaintiffs request judgment against Defendant in an amount in excess of $75,000, together with interest and costs.

## JURY DEMAND

70. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims in this Complaint so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment with respect to their Complaint as follows:

A. Award Plaintiff economic and non-economic compensatory damages, the amount of which is to be determined at trial;

B. Award Plaintiff prejudgment interest on all damages;

C. Award Plaintiff their costs and expenses in this litigation, including reasonable attorneys' fees and expert fees;

D. Award Plaintiff all such other and further relief as may be just, equitable and proper under the circumstances.

Dated: December 17, 2013          Respectfully Submitted,

s/ *Jason E. Luckasevic*
Jason E. Luckasevic, Esquire
PA ID No: 85557
GOLDBERG, PERSKY & WHITE PC
Firm #744
1030 Fifth Avenue, Third Floor
Pittsburgh, PA  15219-6295
Phone:  412.471.3980
Facsimile:  412.471.8308

***Attorney for Plaintiffs***